BURR, APPELLANT, *v.* SOUTH BEND LATHE, INC., APPELLEE.

(No. 1-83-18—Decided June 27, 1984.)

*Michael F. Colley Co., L.P.A.,* and *Dana Deshler, Jr.,* for appellant.

*Cory, Leonard, Witter & Cheney* and *William C. Leonard,* for appellee.

*Per Curiam.* This is an appeal by plaintiff from a judgment entered on March 17, 1983, by the Court of Common Pleas of Allen County, wherein that court ordered that the motion for summary judgment, filed by defendant on March 2, 1981, be granted.

This cause arose on the complaint filed by plaintiff on June 26, 1980, wherein it was alleged that defendant was strictly liable for a traumatic injury plaintiff sustained, on January 15, 1979, at her job as a result of her operating an allegedly defective and unreasonably dangerous mechanical press.

Plaintiff alleged that defendant was in the business of manufacturing and selling not only the brand of machine press involved in this case, but, also, the specific Johnson No. 823 press which was allegedly defective and dangerous.

Defendant denied this allegation in its answer and, indeed, raised the issue again when it moved for summary judgment. In support of its motion, defendant maintained that it was not the manufacturer of the Johnson No. 823 press involved in this case and that it assumed no liability for the manufacture of said press.

Defendant's motion for summary judgment was accompanied by two affidavits and one additional affidavit in support of the motion was filed subsequent to the actual filing of the motion.

These affidavits, along with answers to interrogatories and the pleadings, comprised the material available for the lower court's determination on the motion for summary judgment. These materials also disclose the chronological scheme of events necessary to the resolution of the issue before this court, which scheme of events is as follows:

On September 13, 1937, Johnson Machine and Press Corporation ("Johnson Machine") was incorporated at Elkhart, Indiana. Thereafter, and until September 1, 1956, Johnson Machine manufactured mechanical presses under the brand name of "Johnson."

On September 1, 1956, Johnson Machine became a wholly-owned subsidiary of Bontrager Corporation ("Bontrager"), an Indiana corporation which started in 1925. From September 1, 1956, until August 31, 1962, Bontrager manufactured machine presses under the name of its subsidiary, Johnson Machine, and sold the presses under the "Johnson" brand name.

The machine press that plaintiff was operating on January 15, 1979, was purchased from Bontrager's subsidiary, Johnson Machine, in 1958, by the Yoder Company of Cleveland, Ohio. That this is the same machine press is evident from the statements in the Carmen affidavit and letter attached as an exhibit to defendant's answers to interrogatories, from which it is apparent machine press, serial number 58160, is the machine press herein involved.

On August 29, 1962, Amsted Industries Incorporated ("Amsted") purchased the assets of Bontrager. According to the purchase agreement involved in that transaction, Amsted assumed no responsibility for defective products manufactured by Bontrager.

On August 31, 1962, Amsted assigned all of its rights and obligations under the purchase agreement with Bontrager to South Bend Lathe, Inc., a wholly-owned subsidiary of Amsted which is not the defendant in the instant case. Thereupon, South Bend Lathe, Inc. took possession of the operating assets acquired from Bontrager.

On September 29, 1965, South Bend Lathe, Inc. was dissolved by Amsted, and its assets and liabilities were transferred to Amsted. The former subsidiary was thereafter operated by Amsted, as an unincorporated division called South Bend Lathe ("Division"), which continued to manufacture presses sold under the "Johnson" trade name.

On July 3, 1975, Amsted sold its entire division to LWE, Inc., which, on July 18, 1975, changed its corporate name to South Bend Lathe, Inc., defendant herein. Defendant presently continues to manufacture and sell "Johnson" brand machine presses.

It is apparent that defendant, which is completely independent of Amsted, assumed no responsibility, by the express terms of its purchase agreement with Amsted or otherwise, for "Johnson" presses manufactured or sold in 1958 by Bontrager's subsidiary, Johnson Machine.

In the instant appeal, plaintiff raises one assignment of error, to wit:

"The trial court erred in granting summary judgment on behalf of Appellee, for Appellee was liable as the successor of the manufacturer of the defective product which injured Appellant."

The basic issue to be resolved, therefore, is whether a manufacturing corporation can be held strictly liable, under a products liability theory, for injuries allegedly sustained as the result of a defective and unreasonably dangerous product manufactured by an independent corporation which is distant in time of existence and distinct in corporate structure from the present corporation,

where both the manufacturer and the later corporation manufactured similar products under the same trade name, but where the present corporation has assumed no liability for products manufactured by the manufacturer.

Some confusion is inherent in terminology utilized in some of the authorities concerning predecessor or successor corporations. Essentially a predecessor corporation is simply one earlier in time and the successor later in time. The critical relationship, however, is the chain of responsibility or liability. The merger of two companies may well carry with it the liabilities of each, but the purchase of assets of one corporation by another does not necessarily carry such liability. It is for this reason that careful analysis must be made of the exact relationships involved and that reliance not be placed upon such ambiguous terms as predecessor or successor.

The general rule, we believe, in a case of this type can be stated thusly:

"In the absence of statute, it has generally been held that while a corporation which acquires assets from another corporation does not thereby become liable for the debts and obligations of the transferor, such liability may be imposed where there is an express or implied assumption of the obligations by the transferee; where the transaction for the transfer of assets amounts to a consolidation or merger of the two corporations; where the transferee is a mere continuation or reincarnation of the transferor; or where the transaction for the transfer of assets is fraudulent or otherwise lacks some elements of a purchase in good faith. And more specifically, it has been widely recognized that where one or more of these bases of liability have been established, the transferee corporation may be held liable for the damages or injuries caused by a product issued by the transferor."

See, generally, Annotation (1975), 66 A.L.R. 3d 824.

There is no statute in Ohio that imposes strict liability on independent successor corporations. Moreover, the documentary evidence in this case discloses no express or implied assumption of obligations by defendant, no consolidation or merger between defendant and its predecessor and no evidence of fraud or bad faith.

However, plaintiff herein, in effect, argues that the present defendant is a mere continuation or reincarnation of the predecessor, Bontrager, who sold the press, here involved, in 1958, because defendant "carries on the same business, manufactures the same product line under the same trade name, and profits from the goodwill, advertising, and established market of its predecessor [Bontrager]."

Plaintiff relies heavily on the New Jersey case of *Ramirez* v. *Amsted Industries, Inc.* (1981), 86 N.J. 332, 431 A. 2d 811, wherein that court held in paragraph eight of the syllabus that "where one corporation acquires all or substantially all of the manufacturing assets of another corporation * * * and undertakes essentially the same manufacturing operations as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor." The New Jersey Supreme Court felt that social policies underlying strict products liability were best served by extending strict liability thusly.

We first note that this case is not entirely analogous to the one at bar. The *Ramirez* case, *supra,* involved a suit against Amsted, the independent predecessor of defendant herein, and the New Jersey Supreme Court noted, in that opinion, facts that support the present

defendant's claim that it is entitled to summary judgment. The court states:

"In September 1965 South Bend I, the Amsted subsidiary that had been manufacturing the Johnson product line, was dissolved and its assets and liabilities were assumed by Amsted. The manufacturing business was operated by Amsted until June 1975, at which time the business was sold to a newly-formed Indiana corporation also named South Bend Lathe, Inc. (South Bend II).. As part of this transaction Amsted agreed to indemnify South Bend II for any losses arising out of machinery manufactured and sold prior to the date of closing. *Amsted acknowledges that by virtue of this indemnity agreement, it is responsible for the defense against and payment of any liability claims against South Bend II arising out of any defects in the Johnson product line.*" (Emphasis added.) *Ramirez* v. *Amsted Industries, Inc., supra,* at 339-340.

Indeed, the purchase agreement between defendant and Amsted contains a provision whereby defendant assumed some liability for claims arising with respect to product defects which goods are shipped after June 30, 1975, but did not assume liability for products sold in 1958.

Moreover, we do not adhere to the "mere continuation" theory of liability when facts like those *sub judice* are involved. We find no special relationship existed between defendant and Bontrager that would extend liability.

We agree with the statement of the state Court of Appeals of California in the case of *Ortiz* v. *South Bend Lathe* (1975), 46 Cal. App. 3d 842, 120 Cal. Rptr. 556, a case involving the South Bend Division of Amsted. In that case it was stated, at 847-848, that:

"By the terms of the purchase agreement between Amsted and Bontrager there was no express or implied assumption of liability. There was, as noted, no fraud in the transaction and the consideration flowing to Bontrager was ample. Bontrager and Amsted dealt at arms' length, there was no mixture of officers or stockholders. The two corporate entities were completely separate and distinct both before and after the sale. Under these facts there was neither a consolidation or merger nor a continuation or reincarnation of Bontrager, the old corporation. Before one corporation can be said to be a mere continuation or reincarnation of another it is required that there be insufficient consideration running from the new company to the old.

"* * *

"Amsted did not assume the liabilities of Bontrager either by agreement, express or implied, or involuntarily by operation of law. Nor does it make any difference that the assets which were acquired consisted of trade names, customer lists or business good will. (See *Schwartz* v. *McGraw-Edison Co.,* [92 Cal. Rptr. 776].)

"The evidence of the history of these corporate acquisitions was not in dispute, nor was the purchase agreement between Amsted and Bontrager ambiguous so as to require any factual resolution of extrinsic evidence in interpreting its meaning. Thus it was improper for the trial court to submit the question of Amsted's liability to the jury. The question was purely one of law based upon uncontroverted evidence. * * *"

The same reasoning applies here. Defendant and Amsted dealt at arms length, there is no evidence of mixture of officers or stockholders. The two entities were completely separate and distinct. There is no evidence that there was insufficient consideration running from defendant to Amsted and defendant assumed none of the liabilities of Bontrager, or any of those of Amsted that concerned pre-1975 products.

Further support for this position is found in *Chadwick* v. *Air Reduction Co.*

(N.D. Ohio 1965), 239 F. Supp. 247, the only case we have found dealing with this issue, from an Ohio court. In *Chadwick, supra,* it is stated at 250 that:

"It is the Court's opinion that Air Reduction Company's purchase of the assets of Gordon Armstrong Company, without an agreement to assume liabilities of the seller, created no special relationship between Air Reduction Company and third persons whose rights evolve through former dealings with Gordon Armstrong Company.

"The Court hereby grants the motion of defendant Air Reduction Company for summary judgment in its favor, on the basis that plaintiff has failed to establish the existence of a duty owed to him by the said defendant."

We hold that the absence of an agreement to assume the liabilities of Amsted, by defendant, for products sold prior to 1975, is determinative in the case *sub judice,* and that fact, plus the others disclosed in the chronological scheme, lead this court to hold the trial court did not err in granting summary judgment in this case.

There is, in Ohio, no present judicial imperative to create liability in this type of case. Basically the issue is one for legislative consideration. For this reason while we recognize the differing theories that exist, such as those put forth in plaintiff's cited authorities and in cases like *Bonee* v. *L & M Construction Chemicals* (M.D. Tenn. 1981), 518 F. Supp. 375 (applying Ohio case law), we decide that the evidence in this case required finding that defendant, which acquired the assets of an Amsted Division, was not liable for injuries caused by a product placed in the stream of commerce by a predecessor of Amsted.

*Judgment affirmed.*

MILLER, P.J., GUERNSEY and COLE, JJ., concur.