17

ELIZABETH GAMBLE DEACONESS
HOME ASSOCIATION *v.* TURNER
CONSTRUCTION COMPANY ET AL.

(No. A-8203703—Decided
December 18, 1986.)

Court of Common Pleas of
Hamilton County.

CRUSH, J. This matter is before the court upon motion for summary judgment filed on behalf of defendants Harry Hake & Partners, Inc., Harry Hake III, and Harry Hake and Harry Hake, Jr. & Associates, together with relevant affidavits, depositions and memoranda.

Plaintiff, Elizabeth Gamble Deaconess Home Association, contracted with defendant Turner Construction Company on May 18, 1967 for the construction of a parking garage. The garage was completed in March 1968. Deterioration of the floor area of the garage was discovered in 1978, which allegedly reduced the useful life of the garage from forty years to fourteen years. Plaintiff, wishing to repair and restore the garage to its proper condition, seeks over six million dollars in damages.

The instant motion is directed toward the liability of the architects.

The history of the architects is as follows:

(1) Harry Hake, Sr. — apparently in practice from early 1900s;

(2) Harry Hake and Harry Hake, Jr. — a partnership formed in 1945;

(3) Harry Hake, Jr., d.b.a. Harry Hake and Harry Hake, Jr. — a sole proprietorship started September 1954 or 1955 when Harry Hake, Sr. died;

(4) Harry Hake III, d.b.a. Harry Hake and Harry Hake, Jr. — a sole proprietorship started as early as November 18, 1968 or as late as January 1, 1969 after the death of Harry Hake, Jr.;

(5) Harry Hake & Partners, Inc. — a corporation, articles filed December 22, 1969; and

(6) Harry Hake III — allegedly last principal shareholder of Harry Hake & Partners, Inc., dissolved December 31, 1980.

Plaintiff alleges in its memorandum opposing summary judgment that the various Hake defendants are liable

as the mere continuation of the business entity which contracted with Christ Hospital for the provision of architectural services.

The general rule of successor liability is undisputed herein:

"It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct * * *." *McKee* v. *Harris-Seybold Co.* (1970), 109 N.J. Super. 555, 561, 264 A. 2d 98, 101.

There are found in the cases several exceptions to this general rule:

(1) the purchaser expressly agrees to assume such debts;

(2) the purchaser impliedly agrees to assume such debts;

(3) the transaction amounts to a consolidation of the seller and purchaser;

(4) the transaction amounts to a merger of the seller and purchaser;

(5) the purchasing corporation is merely a continuation of the selling corporation;

(6) the transaction is entered into fraudulently to escape liability; and

(7) the absence of adequate consideration for the sale or transfer (*id.* at 561-562, 264 A. 2d at 101-102);

(8) the transferee corporation is a mere reincarnation of the old corporation (*Cyr* v. *B. Offen & Co.* [C.A. 1, 1974], 501 F. 2d 1145, 1152);

(9) the existence of a basic continuity of enterprise between both corporations (*Bonee* v. *L & M Constr. Chemicals* [D. Tenn. 1981], 518 F. Supp. 375, 381);

(10) product line continuation between corporations (*Ray* v. *Alad Corp.* [1977], 19 Cal. 3d 22, 34, 136 Cal. Rptr. 574, 581-582, 560 P. 2d 3, 10-11).

Plaintiff relies solely on the fifth of the exceptions delineated above, to wit: mere continuation.

It is important to note that the instant matter, involving architectural *services,* does not present a *products-*liability question. See, generally, *Allied Indus. Serv. Corp.* v. *Kasle Iron & Metals* (1977), 62 Ohio App. 2d 144, 16 O.O. 3d 303, 405 N.E. 2d 307. The importance of this lies in the fact that some of the ten exceptions described above pertain to contracts and torts generally; some solely to products-liability matters; and some are interpreted differently depending upon whether the issue involves, or does not involve, products liability.

The rationale for imposing strict liability in tort in products-liability matters has been variously stated:

"*a.* This Section states a *special rule* applicable to sellers of products. * * *

"* * *

"*c.* * * * [T]he justification for * * * strict liability has been said to be that the seller, by marketing his *product* for use and *consumption,* has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to * * * expect * * * that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained * * *." (Emphasis added.) Restatement of the Law 2d, Torts (1965) 349-350, Section 402A, Comments *a* and *c.*

"The purpose of the rule of strict tort liability 'is to insure that the costs of injuries * * * are borne by the manufacturers * * * than by injured persons who are powerless to protect themselves' * * *." *Ray* v. *Alad Corp. supra,* at 30, 136 Cal. Rptr. at 579, 560 P. 2d at 8.

"Concern for victims is stated to be the 'paramount policy' to be promoted by strict products liability." *Rawlings* v. *D.M. Oliver, Inc.* (1974), 97 Cal. App. 3d 890, 897, 159 Cal. Rptr. 119, 122.

" '* * * The public policy behind the evolving common law of products liability is that * * * damages * * * are * * * regarded as an economically and socially necessary cost of doing business. * * *' " *Turner* v. *Bituminous Cas. Co.* (1976), 397 Mich. 406, 244 N.W. 2d 873, 876.

"The very existence of strict liability * * * implies a basic judgment that the hazards of predicting and insuring for the risk from defective products are better borne by the manufacturer than by the consumer." *Cyr* v. *Offen & Co., supra,* at 1154.

The rationale for imposing strict liability upon manufacturers of defective products has not generally been extended to other tort areas. As stated in the Restatement, *supra,* strict products liability is a "special rule." We find stated also the following:

"An architect is not strictly liable for defective designs of a project. He is liable in negligence only * * *." *Van Ornum* v. *Otter Tail Power Co.* (N.D. 1973), 210 N.W. 2d 188, 192, paragraph seven of the syllabus.

Diverse authority has been cited to, or found by, the court on the issue of continuity as a basis for successor liability. Among them are *Ray* v. *Alad Corp., supra; Ortiz* v. *South Bend Lathe* (1975), 46 Cal. App. 3d 842, 120 Cal. Rptr. 556; *Rawlings, supra; Lemire* v. *Garrard Drugs* (1980), 95 Mich. App. 520, 291 N.W. 2d 103; *Turner* v. *Bituminous Cas. Co., supra; Cyr* v. *Offen & Co., supra; McKee* v. *Harris-Seybold Co., supra; Shane* v. *Hobam, Inc.* (E.D. Pa. 1971), 332 F. Supp. 526; *Knapp* v. *North American Rockwell Corp.* (C.A. 3, 1974), 506 F. 2d 361; *Tift* v. *Forage King Indus., Inc.* (1982),

108 Wis. 2d 72, 322 N.W. 2d 14, 32 A.L.R. 4th 172; Annotation (1973), 49 A.L.R. 3d 881. Each of the foregoing cited cases involved a products-liability dispute. Though some of the cases spoke of the principle of continuity in general terms, not limited to products liability, any such general statement must be considered in the nature of *obiter dictum,* and should not necessarily be considered as strong precedent generally on the principle of continuity. We must first consider continuity in the traditional sense. On this point we find stated the following:

" '* * * California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." *Ray* v. *Alad Corp., supra,* at 29, 136 Cal. Rptr. at 578, 560 P. 2d at 7.

" 'An essential foundation of the rule * * * [that equity will regard a new corporation as being a mere continuation of the former corporation under a different name] is the lack of consideration running from the new company to the old.' " *Ortiz* v. *South Bend Lathe, supra,* at 847, 120 Cal. Rptr. at 559.

"We believe that * * * liability founded on a tort, like any other liability, may be impliedly assumed by a new corporation which represents only a 'new coat' for its old owners." *Plaza Express Co.* v. *Middle States Motor Freight, Inc.* (1963), 40 Ill. App. 2d 117, 124-125, 189 N.E. 2d 382, 385.

"Plaintiff argues that defendant is liable because it is a mere continuation of Sheridan * * *, thus falling within

an exception to the general rule. This is the most confused of the four exceptions. * * * The older cases generally contain little discussion on the mere continuation exception. What little can be found is not clear, but the exception seems to encompass the situation where one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization. * * *" *Turner* v. *Bituminous Cas. Co., supra,* at 448-449, 244 N.W. 2d at 892 (Coleman, J., dissenting).

"['] * * * In a consolidation, the two corporations unite and both go out of existence.' * * *" *McKee* v. *Harris-Seybold Co., supra,* at 564, 264 A. 2d at 103.

"['] * * * A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain. * * * ['] " *Id.*

"['] * * * [W]here a mere transformation is had, — parties remaining the same — and the property is transferred by members of the old company transferring their interest in it for an equal interest in it as property of the new, the transaction does not constitute a sale by the one and a purchase by the other. It is simply a change in the manner and form of carrying on the same business by the same persons.[']" *Id.* at 569, 264 A. 2d at 106.

"['] * * * [T]he policy protecting corporate creditors must be weighed against the equally important policy respecting separate corporate entities.[']" *Id.*

"For liability to attach, the purchasing corporation must represent merely a 'new hat' for the seller." *Id.* at 570, 264 A. 2d at 106.

"The main reason why the courts impose liability upon the purchasing corporation when it has not given adequate consideration is that the seller will be thereby rendered insolvent and unable to pay its debts." *Id.* at 571, 264 A. 2d at 107.

"'* * * [O]ther jurisdictions * * * have ascertained the existence *vel non* of a * * * continuation on the basis of whether, immediately after the transaction, the selling corporation continued to exist as a corporate entity and whether, after the transaction, the selling corporation possessed substantial assets with which to satisfy the demands of its creditors." *Knapp* v. *North American Rockwell Corp., supra,* at 365.

"This cluster of cases illustrates the significance which the decisions from other jurisdictions accord to corporate theory and the continued existence of the corporate entity." *Id.* at 366.

The essence of the foregoing "traditional" rule of continuity is the new corporation's being, in essence, the same as the old corporation, albeit under a different name. Thus, the cases describe the new corporation as being a "new hat" (*McKee*) or a "new coat" (*Plaza Express*), or the "continued existence of the corporate entity" (*Knapp*), or the "reincarnation" of the old corporation (*Turner*), or a "reorganization" of the old corporation (*Turner*). Also, the "two corporations unite and both go out of existence" (*McKee*). There is, in addition, an "important policy respecting separate corporate identities"(*McKee*).

The import of these statements is that the rule of continuity traditionally applies to corporations. A corporation exists by legal fiction, and its existence continues beyond the life of any shareholder, director or employee. An individual does not exist legally, even by fiction, beyond his death. Thus, Milacron, Inc., continues to exist as the same basic legal, fictional unit as Cin-

cinnati Milling Machine Company, even though the name has changed, and the shareholders and board of directors are constantly changing. But, Harry Hake, Jr., once deceased, is not the same unit, even fictionally, as Harry Hake III, and even less so the same unit as Harry Hake & Partners, Inc. Under traditional law, a father, a son, and a corporation, succeeding one another, simply cannot be the same thing. This is not to deny that the corporate veil cannot be pierced in an appropriate case. Thus, if Hake & Partners, Inc., was just a fraudulent cover for Harry Hake III (which is not claimed), the corporate veil could be pierced. But, with regard to Harry Hake, Jr., there is no veil to pierce. Additionally, under traditional concepts the companies owned by Harry Hake, Jr., and Harry Hake III, were not legal entities. These companies could not have been sued. Rather, any complaint would have named Harry Hake, Jr., or Harry Hake III, as the defendant, "doing business as" some named company. In brief, there simply is no continuity here of a legal unit under traditional legal concepts.

This is not to say that there are not apparent exceptions. Thus, we find stated the following:

" * * * [T]he predecessor manufacturer in *Alad* was a corporation while here it was a sole proprietorship. This difference, standing alone, is not conceptually different (see *Cyr* [*supra*]) * * *." *Rawlings, supra,* at 900, 159 Cal. Rptr. at 124.

"Defendant corporation, which purchased trucking business of individual, carried depreciable assets of individual on books of corporation at existing book value and issued all of its stock in exchange for net assets received from individual, impliedly assumed individual's liability, if any, on plaintiff's tort claim which arose prior to sale." *Plaza Express Co.,*

*supra,* at paragraph four of the headnotes.

"Corporation, which was formed by employees of company which manufactured allegedly defective product and which was transferee of the assets of the company, with the purchase of good will and contract obligations being central to the transfer, was not immune as a matter of law from suit brought by workman who was injured by product sold by the transferor company." *Cyr, supra,* at paragraph fifteen of the headnotes.

"Thus, where tort liability is concerned, we should look to factors relevant to the specific claim and not be bound by the factors that control where other debts and liabilities are concerned. * * * The corporate veil has never been treated as an iron curtain barring examination of the facts peculiar to the individual case." *Id.* at 1153.

"The mere fact that a corporation is organized to take over a business formerly conducted by a firm or individual is not of itself sufficient to render it liable for a debt incurred by such firm or individual in conducting such business. But where, as in the instant case, it appears that the property is simply transferred to the corporation without consideration other than corporate stock issued to the individuals and the business is but a continuation of the old and is conducted as before, under the same name and management, the corporation, so formed and operated, will be liable for the existing debts of the unincorporated entity, as it will be presumed that such debts were assumed." *Jones* v. *Eppler* (Okla. 1953), 266 P. 2d 451, 458.

"In 1968, Wiberg and Nedland formed a partnership and * * * it * * * 'metamorphosed into a corporation.' As originally incorporated, Wiberg and Nedland were the sole shareholders of the corporation * * *. It retained the

same employees and manufactured identical products * * *, retained the same name, * * * and sold to the same dealers as had the sole proprietorship when owned solely by Wiberg." *Tift* v. *Forage King Indus., Inc., supra,* at 74-75, 322 N.W. 2d at 15.

"* * * [T]he trial court * * * relied upon the rule * * * '* * * that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation.' " *Id.* at 75, 322 N.W. 2d at 15.

"* * * [I]t is apparent * * * that the present corporation is the same as the prior organization. * * * Hence, an injured party who dealt with the predecessor organization could sue the successor." *Id.* at 79, 322 N.W. 2d at 17.

"If there is a business succession, then in effect the plaintiff is suing the 'same' business that produced the original product." *Id.*

Three of these cases involve products liability (*Rawlings, Cyr, Tift*). Each of them contains language showing the overriding policy of consumer protection:

"Concern for victims is stated to be the 'paramount policy' to be promoted by strict products liability." *Rawlings, supra,* at 897, 159 Cal. Rptr. at 122.

"The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer." *Cyr, supra,* at 1154.

"* * * [B]oth the predecessor and the successor manufacturers are in a better position to spread the cost and assume the liability than is a helpless plaintiff." *Tift, supra,* at 82, 322 N.W. 2d at 18.

It is apparent, then, that the *Rawlings, Cyr* and *Tift* decisions, though couched in general terms, are based upon considerations peculiar to prod-

ucts liability. Other courts which have considered the matter have refused to extend the products liability rationale to successor liability generally:

"We * * * refer to the *Cyr* [*supra*] case as helpful authority on the separate issue of what if any *special* rule should be applicable to a successor corporation's *tort* liability for its predecessor's *defective* products. We disagree, however, with any implication in *Cyr* * * * that the settled rule governing a corporation's succession to its predecessor's liabilities *generally* should be modified so as to require such succession merely because of the factors of continuity present in *Cyr* and in the instant case." *Ray* v. *Alad Corp., supra,* at 29-30, 136 Cal. Rptr. at 579, 569 P. 2d at 8.

"However, several recent cases discuss the mere continuation exception, with one extending it considerably." *Turner, supra,* at 449, 244 N.W. 2d at 892 (Coleman, J., dissenting.)

"One case has expanded the meaning of the mere continuation exception. In *Cyr* [*supra*] * * * the Court held that the policy reasons for strict liability in tort were cause for extension of the mere continuation exception." *Id.* at 450-451, 244 N.W. 2d at 893.

"* * * *Cyr* is subject to criticism. The reliance on the rationale for strict liability in tort becomes quite strained when applied to the area of corporate law. * * * [T]he theory of the 'deep pocket' * * * is out of place in corporate law * * *." *Id.* at 452, 244 N.W. 2d at 894.

The other two cases cited above (*Plaza* and *Jones*) do not involve products liability. However, they can be distinguished from the instant matter in essential aspects:

1. In each case there was a transfer of all assets from one business to the other. In the instant matter, the assets of Henry Hake, Jr., passed to his

estate. Hake, Jr., bequeathed to Hake III, his "capital investment" in the profession of architecture, but this did not include the net profits of the business. Hake III did not receive the net profits, but was allowed to *borrow* from them.

2. In each case, the same personnel remained in the new businesses. In the instant matter the personnel changed, as did their respective interests, upon the death of Harry Hake, Jr. (Hake, Jr., no longer, obviously, being involved); and upon incorporation, when a new person was brought into the business.

3. In each case, the business continued as before. In the instant matter, the business radically changed with the death of the sole proprietor. In the *Plaza* and *Eppler* cases, the business (trucking) was not dependent in any particular manner upon any one individual. In the instant matter, the business was architecture, which is a profession peculiarly dependent upon individual skill:

" 'Professional skill, experience, and reputation are things which cannot be bought or sold. They constitute part of the individuality of the particular person, and die with him.' * * * We think the foregoing statement is * * * applicable to the profession of architecture * * *." *Hunt* v. *Street* (1945), 182 Tenn. 167, 174, 184 S.W. 2d 553, 555.

4. In the *Plaza* and *Eppler* cases, the business (trucking) is similar on each assignment. In the instant matter, the profession of architecture requires a significantly particularized exercise of skills on each assignment (unless it be for row houses, or the like). This fact furnishes additional justification not to adopt a products liability rationale in this matter. The design by an architect of a garage does not place into the stream of commerce a product that can cause injury. The design is for a particular structure for a commercial-type enterprise which presumably had input in the design thereof, and which can readily protect itself by the purchase of insurance.

In brief, the *Plaza* and *Eppler* cases present "new hat" or "new coat" situations, where the successor business was identical to the predecessor business. This situation does not exist here, when one sole proprietor was succeeded by another sole proprietor, who was succeeded by a corporation; where the entire business-related assets of the first sole proprietor did not pass to the second sole proprietor and where the incorporation added a new individual; and where the business activity involved was of a uniquely individual professional type. The instant matter does not involve a "new hat" or a consideration.

At most one might argue that there is here a basic "continuity of enterprise," as mentioned in *Bonee, supra* (518 F. Supp. 375). However, the *Bonee* case involves products liability, and, therefore, for the reasons expressed above, is not applicable to the facts of this case.

Except for *Bonee,* cases applying Ohio law have not been so far discussed. No Ohio case has been found exactly on point. However, *Burr* v. *South Bend Lathe, Inc.* (1984), 18 Ohio App. 3d 19, 18 OBR 43, 480 N.E. 2d 105, is instructive. In that case, the Court of Appeals for Allen County refused to adopt successor liability, as described in *Bonee, supra,* even for products-liability matters:

"There is no statute in Ohio that imposes strict liability on independent successor corporations." *Id.* at 21, 18 OBR at 46, 480 N.E. 2d at 108.

"However, plaintiff * * * argues * * * that the present defendant is a mere continuation or reincarnation of the predecessor * * * because defendant 'carries on the same business, manufactures the same product line

24

under the same trade name, and profits from the goodwill, advertising, and established market of its predecessor. * * *' " *Id.*

"*There is, in Ohio, no present judicial imperative to create liability in this type of case. Basically the issue is one for legislative consideration. * * * [W]e recognize the differing theories that exist * * * such as * * * in cases like Bonee [supra] * * *.*" *Id.* at 23, 18 OBR at 48, 480 N.E. 2d at 109.

Admittedly, *Burr* involves a situation where there were two different corporate entities, with no admixture of officers and stockholders. Therefore, its value in the instant matter is very limited. But it does show a reluctance in Ohio to broaden successor liability even in products-liability cases.

In *Auglaize Box Board Co.* v. *Hinton* (1919), 100 Ohio St. 505, 126 N.E. 881, liability was found on the basis of continuity, but the successor corporation took over *all* the assets of its predecessor. Thus, there was a "new hat" situation.

*Price Hill Colliery Co.* v. *Old Ben Coal Corp.* (1930), 38 Ohio App. 151, 175 N.E. 755, involved fraud in the taking over of all the predecessor's assets by a successor corporation, a "new hat" situation where the corporate veil was properly pierced.

*Knight* v. *Burns* (1926), 22 Ohio App. 482, 154 N.E. 345, involved a one-shareholder corporation, a "new hat" situation, where, again, the corporate veil was properly pierced.

There is evidence that neither at the time of Hake, Jr.'s death, nor during the sole proprietorship of Hake III did a partnership exist. There is no evidence to the contrary. The evidence does indicate that plaintiff was, with reasonable promptitude, notified of the makeup of the Hake business at any given time. Most importantly, there is no evidence that plaintiff relied on the Hake business being anything other than what it was at any given time. In fact, Harry Hake, Jr., lived to see the completion of the project in the particulars in which it later, allegedly, appeared defective. None of the employees of Hake, Jr., or Hake III have been individually sued, indicating that the plaintiff does not impart to any of them individual or partnership liability. There is, therefore, no issue of estoppel in this case.

For all the foregoing reasons, it is clear that reasonable minds can come to only one conclusion, and that conclusion being contrary to plaintiff's position.

Summary judgment is awarded as prayed for.

*Judgment for defendants.*